# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| HARRISON METAL CAPITAL III, L.P., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2022-0261-PAF |
| | ) | |
| OLOF MATHÉ and BRADFORD VOGEL, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MIXMAX, INC., | ) | |
| | ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: November 15, 2023
Date Decided: March 27, 2024

A. Thompson Bayliss, Eric A. Veres, ABRAMS & BAYLISS LLP, Wilmington, Delaware; *Attorneys for Plaintiff Harrison Metal Capital III, L.P.*

Catherine A. Gaul, Samuel M. Gross, ASHBY & GEDDES, Wilmington, Delaware; Bruce L. Silverstein, Malibu, California; *Attorneys for Defendants Olof Mathé and Bradford Vogel.*

**FIORAVANTI, Vice Chancellor**

Plaintiff Harrison Metal Capital III, L.P. asserts claims for breach of fiduciary duty against Defendants Olof Mathé and Bradford Vogel in their capacities as directors and officers of Mixmax, Inc. ("Mixmax" or the "Company"). Plaintiff alleges that the Defendants breached their duties by increasing their salaries and engaging in a course of conduct that exposed the Company to material risks of harm to stockpile cash and guarantee their own job security. The Defendants, including the Company as Nominal Defendant, have moved to dismiss for failure to plead demand futility and for failure to state a claim upon which relief can be granted. For the reasons that follow, the court concludes that demand was not futile and the motion to dismiss is granted.

## I.    BACKGROUND

The following recitation of facts is drawn from the Verified Amended Complaint and the documents integral thereto.[1]

### A.    The Parties

Mixmax is a Delaware corporation that sells software as a service.[2] Mathé, Vogel, and non-party Chanpory Rith co-founded Mixmax in June 2014.[3]

---

[1] Citations to the docket in this action are in the form of "Dkt. [#]." In citations, the Amended Complaint in this action, Dkt. 11, will be cited as "Compl." After being identified initially, individuals are referenced herein by their surnames without regard to formal titles such as "Dr." No disrespect is intended.

[2] Compl. ¶ 2.

[3] *Id.* ¶ 23.

Plaintiff is an investment fund that focuses on early-stage ventures.[4]  In October 2014, Plaintiff led Mixmax's first funding round, purchasing a block holding that it has maintained ever since.[5]  Plaintiff currently owns 17.7% of Mixmax's fully diluted equity, including approximately 36% of the Company's Preferred Stock, making Plaintiff the Company's largest stockholder.[6]  In connection with its investment, Plaintiff and the Company entered into:  (1) a Management Rights Letter; (2) an Investors' Rights Agreement ("IRA"); and (3) a Voting Agreement.[7]  The IRA entitles Plaintiff and other "Major Investors" to a variety of approval, notice, informational, and anti-dilution rights.[8]  Plaintiff's ownership of a majority of the Series Seed preferred stock grants it the right to designate one member of Mixmax's board of directors (the "Board").[9]  At the time, Plaintiff designated Michael Dearing, the managing member of Plaintiff's general partner, to the Board.[10]  Dearing left the Board in September 2019, and the seat lay vacant for

---

[4] *Id.* ¶ 14.

[5] *Id.* ¶¶ 14, 24.

[6] *Id.* ¶ 14

[7] *Id.*  Plaintiff has not asserted any claim that the Company breached the IRA, Voting Agreement, or Management Rights Letter.

[8] *Id.* ¶¶ 14, 28.  The IRA has been updated after each funding round to include new investors.  *See id.* ¶ 28.

[9] *Id.* ¶ 14; Defs.' Opening Br. Ex. C. Art. IV § B(5)(b).

[10] Compl. ¶ 15.

most of the next two years.[11]  Plaintiff re-appointed Dearing to the Board in September 2021.[12]

Defendant Mathé is the Company's Chief Executive Officer ("CEO") and the chairman of the Board.[13]  Mathé owns approximately 15.8% of the Company's outstanding stock.[14]  The Amended Complaint alleges that "[a] number of contracts . . . vest in Mathé the ability to control the Board and the Company.  For example, Mathé controls the nomination, election and removal of directors for three of the Company's five board seats."[15]

---

[11] *Id.*

[12] *Id.* ¶ 92.

[13] *Id.* ¶ 17.

[14] *Id.*

[15] *Id.*  Neither the Amended Complaint nor any exhibits submitted in this action provide further explanation of this mechanism.  The Amended Complaint does not allege any claims against Mathé in his capacity as a controlling stockholder, and Defendants' opening brief did not challenge the assertion that Mathé was a controller.  In its answering brief, Plaintiff advanced arguments in opposition to the motion to dismiss that drew upon allegations that Mathé is a controller.  *See, e.g.*, Pl.'s Answering Br. 32–33.  In their reply brief, Defendants disputed the assertion that Mathé is a controller, but at argument they maintained that the Amended Complaint must be dismissed regardless of whether Mathé can be considered a controlling stockholder.  Defs.' Reply Br. 3–5; Dkt. 46 at 52:2–13.  The court assumes, solely for purposes of this motion, that Mathé is a controlling stockholder of Mixmax.  The Amended Complaint refers to the same exercises of this control alternately as being discharged by Mathé and by Mathé and Vogel.  *Compare* Compl. ¶ 64 ("Mathé was then forced to admit that he had kicked Rith off the Board in secret."), *with id.* ¶ 60 ("Mathé and Vogel executed an action by written consent of common stockholders resolving to remove Rith from the Board").  For the sake of clarity, the court refers only Mathé's exercising of control.

Defendant Vogel is the Company's Chief Technology Officer and a director.[16] Vogel owns approximately 15.8% of the Company's outstanding stock.[17]

Rith was a member of the Board from the Company's founding in 2014 until his removal in July 2021.[18]

Non-party Creandum IV, L.P. ("Creandum") purchased Series A Preferred Stock constituting 15.6% of the Company's fully diluted equity in 2018.[19] Creandum's lead role in the company's Series A Financing entitled it to designate a director to the Board, which was increased to five seats in conjunction with the financing.[20] In 2018, Creandum appointed Carl Fritjofsson, the Creandum partner who had driven Creandum's Mixmax investment, as its Board designee.[21] Like Plaintiff, Creandum is a party to the IRA.[22]

Non-party Resolute III, L.P. ("Resolute Ventures") owns 101,010 shares of Mixmax Series Seed-1 preferred stock, constituting 0.4% of the Company's fully

---

[16] Compl. ¶¶ 2, 18.

[17] *Id.* ¶ 18.

[18] *Id.* ¶ 20.

[19] *Id.* ¶¶ 19, 27.

[20] *Id.* ¶ 27.

[21] *Id.* ¶¶ 19, 27.

[22] *Id.* ¶ 28.

diluted equity, and a $2 million SAFE.[23]  Raanan Bar-Cohen is a partner at Resolute Ventures.[24]  Mathé appointed him to the Board in November 2022.[25]  Bar-Cohen filled the vacancy that was created when Mathé removed Rith from the board in July 2021.

The Board's composition at the relevant periods in this case was as follows:

- February 2020 through July 2021:  Mathé, Vogel, Rith, and Fritjofsson;

- July 2021 through September 2021:  Mathé, Vogel, and Fritjofsson;

- September 2021 through November 2022: Mathé, Vogel, Fritjofsson, and Dearing:

- November 2022 through the filing of the Amended Complaint:  Mathé, Vogel, Fritjofsson, Dearing, and Bar-Cohen.

## B.    Factual Background

The Complaint asserts claims arising from four events, which Plaintiff seeks to connect into an overarching scheme.  What follows is a brief description of the supporting allegations.  Other facts are reflected in the court's analysis of the arguments on the motion to dismiss.

---

[23] *Id.* ¶¶ 21, 75.

[24] *Id*.

[25] *Id.* ¶ 117; Pl.'s Answering Br. 7 n.1 (correcting Compl. ¶ 21).

6

### 1. The Payroll Protection Plan Loan

In early 2020, the Company laid off 12 of its then-68 employees to reduce expenses and put the Company on track to reach positive cashflow within three to six months.[26] At the time, the Company had cash reserves to support 17 months of operations at its reduced headcount.[27]

In response to the COVID-19 pandemic, the Federal Government initiated a Payroll Protection Plan, or "PPP."[28] At an April 8, 2020 Board meeting, Mathé told the Board that the Company needed to apply for a PPP loan.[29] Prior to the meeting, Mathé lined up support for the proposal from Vogel and Fritjofsson who, with Mathé, constituted a majority of the then-four-person Board.[30]

Under the terms of the IRA, the Company needed the approval of the Major Investors if the Company were to incur more than $500,000 in debt.[31] On April 9,

---

[26] Compl. ¶ 33.

[27] *Id.*

[28] The CARES Act provided funding to the Small Business Administration to give loans to assist small business that were adversely affected by the COVID-19 pandemic. Qualifying businesses were able to apply for loans to help them make it through the early months of the pandemic. In some circumstances the businesses could qualify for total forgiveness of the loan. *See generally Paycheck Protection Program*, U.S. Dep't of the Treas., https://home.treasury.gov/policy-issues/coronavirus/assistance-for-small-businesses/paycheck-protection-program (last visited Mar. 27, 2024).

[29] Compl. ¶¶ 34–35.

[30] *Id.* ¶ 35.

[31] *Id.* ¶ 44.

2020, Mathé told Plaintiff that the Company needed a PPP loan to maintain operations, that the Company was eligible for the loan, and that the funds would be used properly.[32] Plaintiff and the other Major Investors agreed to the IRA amendments that Mathé requested.[33] Plaintiff alleges that none of Mathé's statements to obtain support for the PPP loan were true.[34]

In an April 10, 2020 email to Mathé, Bar-Cohen highlighted the requirements for PPP loans and identified significant potential legal and reputational risks that a PPP loan application posed for companies that did not fall squarely within those requirements.[35] Plaintiff alleges Mixmax did not fall within those requirements.[36]

On April 30, 2020, Mathé filed an application on behalf of the Company for a $1.12 million PPP loan in which he certified that the loan was necessary to support the Company's ongoing operations and that it would be used to retain workers, maintain payroll, or make mortgage interest, lease, or utility payments.[37] Plaintiff

---

[32] *Id.* ¶¶ 46–47.

[33] *Id.* ¶ 47.

[34] *Id.*

[35] *Id.* ¶¶ 36–37.

[36] *Id.* ¶ 42.

[37] *Id.* ¶¶ 38–39.

asserts that these representations were false, and that Mathé and Vogel knew that they were false.[38]

Immediately after receiving the PPP loan, the Company laid off another 13 employees.[39] Alone, this was a 23% reduction of the Company's then-56-person staff, and together with the prior laying off of 12 employees, this was a reduction by more than a third of the Company's previously 68-person workforce.

On December 11, 2021, Mathé filed an application on behalf of the Company for forgiveness of the PPP loan.[40] In that application, Mathé certified that the funds had been used for payroll costs to retain employees or mortgage interest, rent, or utility expenses and that he understood the legal consequences of presenting false information on the application.[41] The federal government forgave the PPP loan on March 11, 2021.[42] Mathé reported this simply as "Other Income" in the Company's financial statements without further explanation, which Plaintiff asserts was intentionally misleading to investors.[43] To date, neither the Company nor any of its

---

[38] *Id.* ¶ 35.

[39] *Id.* ¶ 42.

[40] *Id.* ¶ 49.

[41] *Id.* ¶ 50

[42] *Id.* ¶ 52.

[43] *Id.*

agents have been named or threatened to be named in any action or proceeding that could potentially subject them to any liability with respect to the PPP loan.

### 2. Mathé Increases His Compensation

Between April 23 and 29, 2020, shortly before submitting the application for the PPP loan, Mathé informed Fritjofsson that Mathé planned to increase his own salary.[44] Based on these discussions, but without board or stockholder approval, Mathé began paying himself a more than 30% increased salary, reflecting a jump from $180,000 to $235,685.[45] Mathé did not notify the Major Investors of executive compensation increases at that time, despite the IRA's requirement that Major Investors approve compensation increases to the Company's executive team and its founders.[46]

On February 4, 2021, while the PPP loan forgiveness application was pending, Mathé increased his compensation again, from a $235,685 annual salary to $320,000, plus an additional potential $80,000 in variable compensation.[47] As before, he did not provide notice to the Major Investors.[48] This increase placed his

---

[44] *Id.* ¶ 40.

[45] *Id.* ¶¶ 40–41.

[46] *Id.* ¶¶ 44, 48; Dkt. 1 Ex. 1 § 3.7.

[47] Compl. ¶ 53.

[48] *Id.*

compensation above the 90th percentile of the Company's peers, despite the Company's failure to perform at a comparable level relative to its peers.[49]

### 3. Accounting Irregularities

Sometime before or during the second quarter of 2021, Mathé, with Vogel's support, inflated the Company's reported revenue by improperly booking voided invoices as income, treating pre-payments of multi-month contracts as being fully earned upon receipt, booking invoices the Company had deemed uncollectible as income, and otherwise booking revenue and accounts receivable invoices improperly.[50]

### 4. The SAFEs

On July 7, 2021, Mathé removed Rith from the Board.[51] Mathé and Vogel informed Fritjofsson and the Company's counsel, but not Rith.[52] Rith's removal left a Board consisting of Mathé, Vogel, and Fritjofsson. The day after Rith's removal, Mathé, Vogel, and Fritjofsson unanimously resolved to pursue financing through the sale of SAFEs.[53]

---

[49] *Id.*

[50] *Id.* ¶ 55.

[51] *Id.* ¶ 60.

[52] *Id.*

[53] *Id.*

Between July 19 and October 8, 2021, the Company raised more than $7 million through the sale of SAFEs to investors (the "SAFE Investors"), doubling the Company's capitalization.[54] Mathé made some or all of the following representations to most of the SAFE Investors to induce their investments: the Company had $10.3 million in annual recurring revenue, the Company was profitable, the Company was cash-flow positive, the Company had a plan to reach $100 million in annual revenue by 2025, and the Company was in compliance with the law and its contracts.[55] Plaintiff alleges that none of these representations were true and that Mathé had no plan to productively use the influx of capital.[56]

Resolute Ventures made the first investment in the SAFE offering, which set the terms for the remaining SAFE Investors.[57] Mathé had turned down an earlier, potentially term-setting offer from Teamworthy Ventures that included a higher conversion cap and, therefore, was less dilutive to Mixmax's other investors in the event of a higher triggering valuation.[58] Mathé forwent Teamworthy Ventures'

---

[54] *Id.* ¶ 75.

[55] *Id.* ¶¶ 69–75.

[56] *Id.* ¶¶ 61, 69–75.

[57] *Id.* ¶ 76.

[58] *Id.* ¶ 61 (comparing the effects of Resolute Ventures' $100 million and Teamworthy Ventures' $200 million conversion caps).

proposal because it required a greater degree of due diligence and, instead, Mathé sought out low-diligence investors despite the less favorable terms they offered.[59]

On August 13, 2021, the Company delivered to Plaintiff an operating update, which disclosed the Company's sale of SAFEs and the funds raised in the offering.[60] Upon learning about the SAFEs, Dearing expressed his concerns and frustration to Fritjofsson over the Company's governance and communications.[61] Fritjofsson agreed that "[s]urely there are many companies out there with stronger governance" and "[c]ommunications between the company and shareholders can of course improve," and stated that "I did not think the lack of information was ok. I reminded [Mathé] of this multiple times."[62] Fritjofsson maintained that he and Mathé had discussed the plan for the SAFEs and that Fritjofsson had been assured that the Company could pursue the financing without Plaintiff's approval.[63] After a couple of exchanges, Fritjofsson forwarded the exchange to Mathé with the message "FYI. Det börjar blåsa."[64] Plaintiff asserts that this means, idiomatically, to "it's starting

---

[59] *Id.*

[60] *Id.* ¶ 92.

[61] Pl.'s Answering Br. Ex. B.

[62] *Id.* at MIXMAX0375954–55.

[63] *Id.* at MIXMAX0375954.

[64] *Id.*

13

to heat up" or "it's starting to blow up."[65]  Dearing's final message in the exhibit submitted to the court expressed that Dearing was "so sorry that we are so at odds on this now."[66]

Plaintiff then exercised its board representation rights and appointed Dearing to the Board in September 2021.[67]

### 5.    The Ensuing Litigation

Once Dearing rejoined the Board, he began demanding corporate books and records in his director capacity.  On October 12, 2021, Dearing delivered a demand to inspect the Company's books and records pursuant to Section 220(d) of the Delaware General Corporation Law.[68]   On October 22, 2021, Dearing filed a complaint to enforce his inspection rights ("the 220 Action").[69]   On October 28, 2021, the Board formed a litigation committee comprising Mathé, Vogel, and Fritjofsson to respond to Plaintiff's demand.[70]  Over the course of what proved to be a contentious 220 Action,[71] the Company produced responsive documents and

---

[65] Compl. ¶ 90

[66] Pl.'s Answering Br. Ex. B at MIXMAX0375954.

[67] Compl. ¶ 92.

[68] *Id.* ¶ 93.

[69] *Dearing v. Mixmax, Inc.*, C.A. No. 2021-0918-PAF.

[70] Compl. ¶ 97.

[71] *See Dearing*, C.A. No. 2021-0918-PAF, 37:12–16 (Del. Ch. Sept. 9, 2022) (TRANSCRIPT).

facilitated various fact-finding interviews and a deposition.[72] Much of that information forms the basis of this action.

On March 18, 2022, Plaintiff filed this action.[73] The original Complaint asserted a single claim to invalidate the Board's approval and preferred stockholders' ratification of certain increases to Mathé and Vogel's compensation pursuant to 8 *Del. C.* § 205.[74] Plaintiff argued that the approval and ratification should be invalidated because: the board's approval was invalid because it did not identify any dates of the actions to be ratified, a majority of the voting Board was conflicted, and the Board was not fully informed; the stockholders' ratification was improper because it was uninformed; the ratification itself violated Plaintiff's own right to consult and advise management pursuant to an agreement it entered when it first invested in the Company; and the compensation increases were not undertaken under belief that they were in compliance with the law and it would be unjust to permit the ratification.[75]

As the 220 Action proceeded, Plaintiff retained the forensic accounting firm of Alvarez & Marsal ("A&M") to review the company's financial records that were

---

[72] Compl. ¶¶ 103, 118–19.

[73] Dkt. 1.

[74] *Id.*

[75] Dkt. 1 ¶¶ 27–35.

15

made available for inspection.[76] A&M prepared a report (the "A&M Report") identifying inconsistencies between the Company's sales and general ledgers.[77] Plaintiff attached the A&M Report to a May 6, 2022 status report in the 220 Action, which requested that Plaintiff's accountants be allowed to interface with the Company's.[78] On May 26, 2022, the Board held a meeting at which Mathé, Vogel, Fritjofsson, and the Company's counsel represented that they had not reviewed the A&M Report and that they did not plan to take any action with respect to the matters raised therein.[79] Despite representing to Dearing that no action would be taken, the Company fully restated its 2021 and 2022 financials on September 15, 2022.[80]

On or around November 15, 2022, eight months after the filing of Plaintiff's original Complaint, Mathé appointed Bar-Cohen to fill the Board vacancy that resulted from Rith's removal in mid-2021.[81]

On December 5, 2022, Plaintiff filed an Amended Complaint.[82] The Amended Complaint is much broader than the original Complaint, which was

---

[76] Compl. ¶¶ 10, 110.

[77] *Id.*

[78] *Id.* ¶ 126.

[79] *Id.* ¶ 127.

[80] *Id.*

[81] *Id.* ¶ 117; Pl.'s Answering Br. 7 n.1.

[82] Compl.

limited to a single claim seeking, pursuant to 8 *Del. C.* § 205, to invalidate ratifications of corporate actions.[83] The Amended Complaint abandons the Section 205 claim and instead asserts derivative claims against Mathé and Vogel for breaches of their fiduciary duties owed to the Company in their capacities as directors and officers.[84] At the time of the Amended Complaint, the Board consisted of Mathé, Vogel, Fritjofsson, Dearing, and Bar-Cohen (the "Demand Board").

Defendants filed a Motion to Dismiss on January 23, 2023, for failure to plead demand futility and for failure to state a claim upon which relief can be granted.[85] Following briefing,[86] the court heard oral argument.[87] What follows is the court's ruling on that motion.

## II.  ANALYSIS

All of the claims alleged in the Amended Complaint are asserted on behalf of the Company. Defendants have moved to dismiss under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted and under Rule 23.1 for failure to plead demand futility. The court concludes that the Amended

---

[83] *Compare id.*, *with* Dkt. 1.

[84] Compl. Ex. 2.

[85] Dkt. 24.

[86] Dkts. 30, 35, 37.

[87] Dkt. 45.

Complaint must be dismissed under Rule 23.1 for failure to plead demand futility and, therefore, does not reach the Rule 12(b)(6) argument.[88]

Section 141(a) of the DGCL provides that a corporation "shall be managed by or under the direction" of its board of directors. 8 *Del. C.* § 141(a). This managerial authority encompasses the ability to determine whether to "initiate, or refrain from entering, litigation." *Zapata Corp. v. Maldonado*, 430 A.2d 779, 782 (Del. 1981). Through derivative litigation, a stockholder may attempt to assert a claim on behalf of a corporation. To do so without the consent of the corporation's board of directors, the stockholder must "state with particularity: (A) any effort by the derivative plaintiff to obtain the desired action from the entity; and (B) the reasons for not obtaining the action or not making the effort." Ct. Ch. R. 23.1. The demand obligation articulated in Rule 23.1 reflects a "a substantive requirement that ensures that a stockholder exhausts his intracorporate remedies, provides a safeguard against strike suits, and assures that the stockholder affords the corporation the opportunity to address an alleged wrong without litigation and to control any litigation which

---

[88] The court declines to find that Plaintiff's belated filing of the affidavit required by Rule 23.1 eliminates its standing to bring the claim. This court has allowed derivative plaintiffs to remedy this oversight in the past, and given Plaintiff's prompt filing of an affidavit once Defendants brought it to Plaintiff's attention, the court declines to dismiss the case on these grounds. *See Bamford v. Penfold, L.P.*, 2020 WL 967942, at *26 n.20 (Del. Ch. Feb. 28, 2020) (granting "leave to cure this procedural oversight" in a ruling on a motion to dismiss).

18

does occur." *United Food & Com. Workers Union v. Zuckerberg*, 262 A.3d 1034, 1047 (Del. 2021) (cleaned up).

The Plaintiff in this action did not make a pre-suit demand. Therefore, Plaintiff must persuade the court that demand is excused as futile. Demand is futile if at least half of the members of the Demand Board are unable to consider a demand for one of the three reasons outlined in *Zuckerberg*:

(i) [T]he director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;

(ii) [T]he director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; [or]

(iii) [T]he director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.

*Id.* at 1059. "To comply with Rule 23.1, the plaintiff must meet 'stringent requirements of factual particularity that differ substantially from . . . permissive notice pleadings.'" *Id.* at 1048 (alteration in original) (quoting *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000)). "When considering a motion to dismiss a complaint for failing to comply with Rule 23.1, the Court does not weigh the evidence, must accept as true all of the complaint's particularized and well-pleaded allegations, and must draw all reasonable inferences in the plaintiff's favor." *Id.* "This analysis is fact-intensive and proceeds director-by-director and transaction-by-transaction." *Khanna v. McMinn*, 2006 WL 1388744, at *14 (Del. Ch. May 9, 2006).

19

Where, as here, the original Complaint did not assert derivative claims, the demand futility analysis is conducted as of the date of the filing of the Amended Complaint. *See Braddock v. Zimmerma*n, 906 A.2d 776, 786 (Del. 2006) (holding that demand futility should be analyzed as of the date of an amended complaint asserting derivative claims when such claims were not "validly in litigation" immediately prior to the amendment).

The parties agree that the Demand Board consists of five members: Dearing, Mathé, Vogel, Fritjofsson, and Bar-Cohen. Therefore, to excuse demand, Plaintiff must make particularized allegations giving rise to a reasonable inference that three members of the Demand Board were unable to consider demand under *Zuckerberg*. If Plaintiff cannot carry that burden, then the Amended Complaint must be dismissed under Rule 23.1.

It is undisputed that Dearing—the principal of the Plaintiff—is capable of considering a demand. For purposes of this opinion, the court also assumes that Mathé is a controlling stockholder and that demand is excused as to Mathé and Vogel. Thus, the issue of demand futility turns on whether Bar-Cohen and Fritjofsson are capable of considering a demand to pursue the claims alleged in the Amended Complaint against Mathé and Vogel.

20

## A. The Focus of the Inquiry

The Amended Complaint does not specifically state that demand is excused or that Bar-Cohen or Fritjofsson are incapable of considering a demand. Nor does the Amended Complaint allege that either Bar-Cohen or Fritjofsson received a material personal benefit from any of the challenged misconduct. The Amended Complaint does, however, contain allegations that Fritjofsson faces a substantial likelihood of liability for his role in some of the claims asserted against Mathé and Vogel.[89]

Defendants argue in their opening brief that neither Fritjofsson nor Bar-Cohen face a substantial likelihood of liability for a variety of reasons, including that Fritjofsson and Bar-Cohen are exculpated under Mixmax's certificate of incorporation.[90] Plaintiff chose not to address that argument in its answering brief. Plaintiff's failure to brief that argument constitutes waiver. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived."); *Larkin v. Shah*, 2016 WL 4485447, at *2 n.5 (Del. Ch. Aug. 25, 2016) ("Plaintiffs

---

[89] *See* Compl. ¶ 19 (asserting that "Fritjofsson faces a substantial likelihood of liability" in connection with his approving the application to forgive the PPP loan, "complicity in Defendants' scheme to hide the SAFE financing" from Rith and Plaintiff, and his "refusal to investigate irregularities in the Company's accounting").

[90] Defs.' Opening Br. 23–24, 26–36, 44–47, 53–55; *id.* Ex. C Art. IX.

waived this argument by omitting it entirely from their Brief in Opposition to Defendants' Motion to Dismiss.").

In its answering brief, Plaintiff pivoted, arguing that demand was excused because Fritjofsson and Bar-Cohen each lack independence from Mathé.[91] Thus, the focus of the analysis will be whether the Amended Complaint contains particularized allegations which create reason to doubt that Bar-Cohen and Fritjofsson are independent of Mathé.

## B. Bar-Cohen

Bar-Cohen was appointed to the board in November 2022. He is a partner of Resolute Ventures, which is both a Mixmax stockholder and an investor in the SAFEs.[92] The only allegations connecting Bar-Cohen to Mathé concern his service on the Mixmax board and his leading Resolute Ventures' investments in the Company. There are no allegations that Mathé has any investment in or managerial position at Resolute Ventures or that he possesses any ability to influence Bar-Cohen's position or compensation at Resolute Ventures. There are no allegations that Mathé and Bar-Cohen have any social or familial connections or that Bar-Cohen

---

[91] Pl.'s Answering Br. 44–48; *id.* at 44 ("Fritjofsson cannot impartially consider demand because, like Vogel, he has demonstrated his lack of independence from Mathé"); *id.* at 46 ("Like Vogel and Fritjofsson, Bar-Cohen lacks independence from Mathé.").

[92] Compl. ¶ 21.

22

participated as a director of Mixmax in any of the purported misconduct that is alleged in the Amended Complaint.[93]

Plaintiff's theory as to Bar-Cohen's lack of independence relies on two facts. The first is Mathé's prior removal of Rith as a director, which, according to Plaintiff, shows that Mathé is willing and able to take retributive action against directors that disagree with him. The second is the timing of Bar-Cohen's appointment by Mathé during this litigation. Those facts do not create reason to doubt Bar-Cohen's independence.

The analysis starts with the presumption that Bar-Cohen is independent. *Aronson v. Lewis*, 473 A.2d 805, 815 (Del. 1984), *overruled on other grounds by*

---

[93] Plaintiff's conclusory allegation that Bar-Cohen "has a material personal and professional stake in covering for or ignoring Defendants' misconduct" does not support an inference that Bar-Cohen lacks independence from Mathé. *Id.*; *see In re INFOUSA, Inc. S'holders Litig.*, 953 A.2d 963, 985 (Del. Ch. 2007) ("Rule 23.1 requires that a plaintiff who asserts demand futility must comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings governed solely by Chancery Rule 8(a). Vague or conclusory allegations do not suffice to challenge the presumption of a director's capacity to consider demand." (internal quotation marks omitted)). Rather, the well-pleaded allegations of the Amended Complaint reflect that Bar-Cohen and Resolute Ventures were independent throughout the Company's marketing of the SAFEs and dealing at arm's length to obtain the best deal for Resolute Ventures. Bar-Cohen was not a Mixmax director at the time of the SAFE investments, and his proposal of terms beneficial to Resolute Ventures do not weigh against a finding of his independence. Nor do the Amended Complaint's allegations that "Mathé accepted now-director Bar-Cohen's SAFE offer without negotiation" and that Bar-Cohen, on behalf of Resolute Ventures, had recommended to Mathé that Mixmax not apply for a PPP loan support the inference that Bar-Cohen lacked independence from Mathé. Compl. ¶¶ 36, 78.

23

*Brehm*, 746 A.2d 244;[94] *see Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1048–49 (Del. 2004) ("The key principle upon which this area of our jurisprudence is based is that the directors are entitled to a *presumption* that they were faithful to their fiduciary duties. In the context of presuit demand, the burden is upon the plaintiff in a derivative action to overcome that presumption." (emphasis in original) (footnote omitted)); *see also In re MFW S'holders Litig.*, 67 A.3d 496, 509 (Del. Ch. 2013) ("Under Delaware law, there is a presumption that directors are independent."), *aff'd*, 88 A.3d 635 (Del. 2014).

A derivative plaintiff cannot successfully rebut the presumption of a director's independence by simply alleging the director was elected or appointed by an interested party. *Aronson*, 473 A.2d at 816; *see Zuckerberg*, 262 A.3d at 1063–64

---

[94] In *Brehm*, 746 A.2d at 253–54, the Delaware Supreme Court overruled seven precedents, including *Aronson*, to the extent those precedents reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested a deferential appellate review. *See Brehm*, 746 A.2d at 253 & n.13 (overruling in part on this issue *Aronson*, 473 A.2d at 814; *Scattered Corp. v. Chicago Stock Exch., Inc.*, 701 A.2d 70, 72–73 (Del. 1997), *as modified on denial of reh'g* (Oct. 22, 1997); *Grimes v. Donald*, 673 A.2d 1207, 1217 n.15 (Del. 1996); *Heineman v. Datapoint Corp.*, 611 A.2d 950, 952 (Del. 1992); *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991); *Grobow v. Perot*, 539 A.2d 180, 186 (Del. 1988); and *Pogostin v. Rice*, 480 A.2d 619, 624–25 (Del. 1984)). The *Brehm* Court held that going forward, appellate review of a Rule 23.1 determination would be *de novo* and plenary. 746 A.2d at 253–54. The seven partially overruled precedents otherwise remain good law. This decision does not rely on any of them for the standard of appellate review. Although the technical rules of legal citation would require noting that each was reversed on other grounds by *Brehm*, this decision omits the subsequent history, which creates the misimpression that *Brehm* rejected core elements of the Rule 23.1 canon.

24

(concluding that it was not reasonably conceivable that directors lacked independence from controller who protected their positions on the board from public criticism and an age-out requirement); *see also In re Rouse Props., Inc.*, 2018 WL 1226015, at *15 (Del. Ch. Mar. 9, 2018) (recognizing that "the appointment of a director onto the board, even by the controlling stockholder, is insufficient to call into question the independence of that director" under the lower 12(b)(6) standard); *Williamson v. Cox Commc'ns, Inc.*, 2006 WL 1586375, at *4 (Del. Ch. June 5, 2006) ("The fact that Cox and Comcast nominated directors to the At Home board does not, without more, establish actual domination or control. To hold otherwise would have a chilling effect on transactions that depend on a particular shareholder being able to appoint representatives to an investee's board of directors." (footnote omitted)).

To be sure, a director's appointment by a controller "is not necessarily irrelevant." *In re Ezcorp Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *41 (Del. Ch. Jan. 25, 2016); *see also In re Viacom Inc. S'holders Litig.*, 2020 WL 7711128, at *22 (Del. Ch. Dec. 29, 2020), *as corrected* (Dec. 30, 2020) ("threats of removal, even in circumstances where the directorship is not demonstrably material, cannot be ignored in the independence analysis"). But "[t]here must be coupled with the allegation of control such facts as would demonstrate that through personal or other relationships the directors are beholden to the controlling person."

25

*Aronson*, 473 A.2d at 815. "To establish lack of independence, [Plaintiff] must show that [Bar-Cohen is] beholden to [Mathé] or so under [his] influence that [Bar-Cohen's] discretion would be sterilized." *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993) (internal quotation marks omitted). Thus, Mathé's selection of Bar-Cohen to serve on the Board, without more, is insufficient to reasonably question Bar-Cohen's independence.

Plaintiff argues that Mathé's prior removal of Rith and the timing of Bar-Cohen's appointment in November 2022 create an inference that Bar-Cohen lacks independence from Mathé.[95] Plaintiff points to *Ezcorp*, 2016 WL 301245, and *Viacom*, 2020 WL 7711128, as drawing such an inference under analogous circumstances. Those cases are readily and materially distinguishable on their facts.

*Ezcorp* was a derivative action challenging three multi-million-dollar advisory contracts between EZCORP, Inc. ("EZCORP") and a consulting firm affiliated with EZCORP's controller, Phillip Cohen. 2016 WL 301245, at *1. In 2014, EZCORP's two-member audit committee terminated the renewal of one of these agreements, and two months later, Cohen used his voting power to remove three directors, including the two audit committee members. *Id.* at *6. A fourth director resigned the same day. *Id.* Cohen filled one of the vacancies with the

---

[95] Pl.'s Answering Br. 47.

consulting firm's former managing director, who was still a paid consultant to the firm. *Id.* Then, just one hour after the plaintiff filed his derivative complaint, Cohen expanded the board from four to seven directors and filled the new seats. *Id.* at *7. One of the new directors had previously served as an EZCORP director and had approved two of the three challenged agreements while serving on the audit committee. *Id.* at *4. Another of the new directors was the former EZCORP CEO, whose health benefits were still being paid by the company. *Id.* at *42. He was also a paid consultant to EZCORP until just eight months before the suit was filed, and the company publicly identified him as a non-independent director. *Id.*

Ultimately, the court concluded that there were sufficient well-pleaded allegations to doubt the independence of six of the seven directors, and the court did not reach the seventh. *Id.* at *35. Three of the directors had a paid employment or consulting relationship with the company or its affiliates, and the company identified them as not being independent under the NASDAQ listing standards. *Id.* at *35–39. In finding reason to doubt the independence of these directors, the court did not need to consider Cohen's prior removal of directors. A fourth director's family owned a minority stake in an EZCORP affiliate, where Cohen had the "ability as a majority holder to take action to reduce the value of the minority stake or eliminate it." *Id.* at *39. Some of the director's family members were employed by the same subsidiary, so Cohen also had the "ability to influence the future employment of members of

27

[the director's] family." *Id.* at \*38. As to that director, the court concluded that if there were any doubt regarding the director's lack of independence, Cohen's prior removal of the two audit committee members provided "incremental weight" to "tip the scales" in favor of the plaintiff. *Id.* at \*39.

The fifth director, Roberts, was a named defendant. The court previously concluded the complaint stated a claim against that director for breach of fiduciary duty. *Id.* at \*31. He approved two of the challenged agreements while serving as a member of the audit committee and had approved prior, similar agreements between the company and another Cohen affiliate in his former capacity as the audit committee's chair. *Id.* at \*3, \*39. Roberts had retired from board service, but Cohen brought him out of retirement and appointed him just an hour after the plaintiff had filed his complaint—circumstances that "suggest the director might be an easy tool, deferential, glad to be of use." *Id.* at \*41 (internal quotation marks omitted). It was those circumstances, combined with Cohen's demonstrated willingness to take retributive action, that created reason to doubt Roberts's independence from Cohen. *Id.* at \*42; *see id.* at \*39 (explaining that the court "holds only that when these factors are viewed in their totality and not in isolation from each other, a good reason exists to doubt Roberts' independence" (internal quotation marks omitted)).

The sixth director, Rotunda, was EZCORP's former CEO and, like Roberts, appointed by Cohen immediately after the filing of the complaint. *Id.* at \*7, \*42.

28

After departing as CEO, Rotunda entered into a lucrative consulting agreement with the company. *Id.* at *42. The compensation element ended eight months prior to the filing of the lawsuit, but the company continued to pay for his health benefits for more than a year after the litigation began. *Id.* The company also identified him as a non-independent director under the NASDAQ listing rules. *Id.* Considering all of those factors, the court concluded that the combination of Rotunda's past ties with Cohen and the company, Cohen's retributive behavior, and Rotunda's lack of independence for purposes of NASDAQ listing standards together "raise[d] a reasonable doubt as to his ability to consider a litigation demand impartially." *Id.*

*Viacom* was a class action challenging the merger of Viacom, Inc. ("Viacom") and CBS Corporation ("CBS")—sister companies controlled by National Amusements, Inc. ("NAI"), and, ultimately, Shari Redstone. 2020 WL 7711128, at *2. The complaint asserted claims against NAI and Redstone as controllers, and against the directors who served on the Viacom special committee for breaches of the duty of loyalty. *Id.* The court held that a combination of well-pleaded allegations required denial of the motion to dismiss. *Id.* at *10–25. Among those allegations was a detailed history of Redstone's retributive actions and threats at NAI, Viacom, and CBS. *Id.* at *21–22 (analyzing what the court described as "Ms. Redstone and NAI's Demonstrated History of Ouster"). Notably among them was NAI's removal of several independent Viacom directors shortly after they sent a letter warning NAI

29

not to undermine their independence. *Id.* at *6. NAI replaced those removed directors with the four directors who later comprised the Viacom special committee, each of whom had known Redstone outside of Viacom. *Id*. at *25. In connection with appointing the four special committee members to the board, NAI agreed to indemnify them for any liability arising from their appointments. *Id*. at *6. The committee members' performance—or perhaps non-performance—of their duties in negotiating the transaction with CBS further undermined the presumption of their independence. The court identified a laundry list of well-pleaded facts which depicted a submissive special committee that allowed NAI to dictate the process and reflected the committee's "desire to placate the controller, not to land the best transaction possible for all Viacom stockholders." *Id*. at *24. That, along with Redstone's documented history of retributive acts and outside relationships with the special committee members, led the court to question their independence from the controller. *Id.* at *22 ("Plaintiffs have clearly alleged that NAI has a willingness to take [retributive] action, and this willingness, coupled with other facts, can reasonably be inferred to have affected the Viacom Committee Defendants' independence at the pleading stage."); *id.* at *25 ("The Complaint's allegations regarding the Viacom Committee Defendants' personal relationships with Ms. Redstone, the circumstances of their appointments to the Viacom Board and the Viacom Committee, their knowledge of NAI's past retributive behavior, and their

30

actions as special committee members that reasonably infer a controlled mindset, taken together, sufficiently plead reasonably conceivable breaches of the duty of loyalty on the part of each Viacom Committee Defendant.").

Both *Ezcorp* and *Viacom* explained that a director's appointment by an interested controller who had previously removed directors is not, standing alone, dispositive. In each case, the court concluded there was reason to doubt the director's independence from the controller when considered together with additional significant factors that are not present here. *Ezcorp*, 2016 WL 301245, at *39, *43; *Viacom*, 2020 WL 7711128, at *22. Plaintiff's only proffered additional factor is the timing of Bar-Cohen's appointment—but it is not on par with the allegations in *Ezcorp* or the "unsettling circumstances" of *Viacom*. 2020 WL 7711128, at *6.

Unlike in *Ezcorp* and *Viacom*, the Amended Complaint does not attribute Rith's removal to a specific dispute over a self-interested act by the controller. The circumstances leading to Rith's removal, which are relegated to a couple of sentences, lack in detail. *See* Compl. ¶ 59 (alleging that Rith "was a likely dissenter" to the SAFE offering and that in the year before his removal "Rith had vocally opposed various of Mathé's actions, including his approach to growth, hiring, terminations, employee equity grants, and even Vogel's lavish spending on personal

meals and entertainment.").[96] Rith was removed in July 2021. The seat remained vacant for sixteen months before Bar-Cohen's appointment in November 2022. At the time of Bar-Cohen's appointment, Plaintiff's original Complaint, which had only asserted a Section 205 claim, had been on file for eight months. Plaintiff's suggestion that Mathé somehow anticipated Plaintiff's complete re-write of its complaint is unpersuasive, and Plaintiff has not alleged particularized facts creating a reasonable inference that Bar-Cohen's appointment or its timing creates reason to doubt Bar-Cohen's independence. Unlike the returning director in *Ezcorp* who had proved loyal to supporting the controller's wishes, Bar-Cohen had not previously served on the Mixmax board, and he was not involved in the alleged misconduct underlying the action. There is no allegation as to Bar-Cohen's compensation as a

---

[96] Plaintiff here is not a typical stockholder derivative plaintiff. Plaintiff's principal, Dearing, obtained more than 168,317 documents in response to a books and records demand as a Mixmax director. *Dearing v. Mixmax, Inc.*, 2023 WL 2632476, at *7 (Del. Ch. Mar. 23, 2023). Unlike the typical stockholder plaintiff seeking books and records, who is limited to inspection of documents "necessary and essential" to the stockholder's stated purpose, Dearing exercised his unfettered right to inspect the Company's books and records. *Compare* 8 *Del. C.* § 220(d) ("Any director shall have the right to examine the corporation's stock ledger, a list of its stockholders and its other books and records for a purpose reasonably related to the director's position as a director. . . . The burden of proof shall be upon the corporation to establish that the inspection such director seeks is for an improper purpose."), *with Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 116 (Del. 2002) ("The scope of a stockholder's inspection, however, is limited to those books and records that are necessary and essential to accomplish the stated, proper purpose." (internal quotation marks omitted)). Dearing had also served on the board both before and after Rith's removal.

Mixmax director (if any), let alone that any such compensation or the board membership itself is material to him.[97]  Additionally, as a partner of Resolute Ventures, Bar-Cohen is incentivized to monitor his company's investment, again unlike the directors in *Ezcorp* or *Viacom*.  Having considered all of the particularized facts alleged as to the relationship between Bar-Cohen and Mathé contextually and in their totality, the court concludes that the Amended Complaint does not create reason to doubt Bar-Cohen's ability to consider a demand.

---

[97] *Cf. Zuckerberg*, 262 A.3d 1034.  There, Zuckerberg, through his voting control of Facebook, Inc. ("Facebook"), had the power to remove any of Facebook's directors. Though the plaintiff did not allege that Zuckerberg had effected a retributive removal of directors in the past, it did point to his refusal to remove certain directors, among other allegations, in its arguments against directors' ability to consider demand.  With respect to Peter Thiel, the plaintiff alleged that Zuckerberg kept him on the board in the face of public calls for his removal, and argued that Zuckerberg and Thiel's close friendship, benefits the venture capital firm at which Thiel was a partner allegedly derived from its association with Facebook, and Thiel's long tenure on the board undermined Thiel's independence. *Id.* at 1062–63.  As to Erskine Bowles, the plaintiff highlighted that the board, which Zuckerberg chaired, waived the mandatory retirement age for Bowles, allowing him to remain on the board, and that the challenged transactions had involved advisors with whom Bowles had historically been affiliated.  *Id.* at 1064.  The Court concluded that both Thiel and Bowles were independent of Zuckerberg, reasoning that the plaintiff had not alleged that the director position was material to either. *Id.* at 1063–64.  So too here.  Plaintiff has not presented any allegations as to Bar-Cohen's interest in the board seat, or that Mathé's ability to remove him would cloud Bar-Cohen's presumed fidelity to his fiduciary duties.

## C.     Fritjofsson

The Amended Complaint's allegations that seek to undermine Fritjofsson's independence from Mathé are even weaker than those asserted against Bar-Cohen.[98]

---

[98] Plaintiff does not allege or argue that Fritjofsson received any benefit from the challenged conduct. *See* Dkt. 46 at 34:20–22. As noted earlier, the Amended Complaint alleged that Fritjofsson could not consider a demand because he faced a substantial likelihood of liability, but Plaintiff abandoned that argument in its answering brief. *Emerald P'rs*, 726 A.2d at 1224 (Del. 1999) ("Issues not briefed are deemed waived."). Even if it was not waived, it is without merit. "[T]he mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors, although in rare cases a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists." *Aronson*, 473 A.2d at 815. Because of the heightened pleading standards under Rule 23.1, a plaintiff seeking to displace a board and bring derivative claims must plead with particularity all facts supporting the futility of demand. Additionally, "a Section 102(b)(7) provision removes the threat of liability and protracted litigation for breach of care claims" and "exculpated care claims do not satisfy *Aronson*'s second prong." *Zuckerberg*, 262 A.3d at 105 (internal quotation marks omitted) (citing *In re Cornerstone Therapeutics Inc., S'holder Litig.*, 115 A.3d 1173 (Del. 2015)). "Whether a director faces a substantial likelihood of liability from a non-exculpated claim turns primarily on . . . whether the complaint pleads particularized facts that support a reasonable inference that the director's decision could be attributed to bad faith." *Simons v. Brookfield Asset Mgmt. Inc.*, 2022 WL 223464, at *11 (Del. Ch. Jan. 21, 2022) (alteration in original) (internal quotation marks omitted). The Amended Complaint lacks particularized allegations that Fritjofsson acted in bad faith—a phrase that does not even appear in the Amended Complaint. Notably, neither the Amended Complaint nor the Plaintiff's brief alleged or explained how Fritjofsson, who was protected by an exculpatory charter provision under 8 *Del. C.* § 102(b)(7), could face a substantial likelihood of liability where he has not been named as a defendant in this case or any other action or proceeding challenging any of the alleged misconduct asserted here. *Cf. Guttman v. Huang*, 823 A.2d 492, 504 (Del. Ch. 2003) ("In this respect, it is important to note that none of these five defendants is even named as a defendant in the pending federal securities suits. The complaints in those suits—which were recently dismissed without prejudice for failing to state a claim—were the primary source of information used by the plaintiffs in this action.").

34

Plaintiff argues that Fritjofsson acted to advance Mathé's self-interest by voting for and not objecting to the conduct that Plaintiff challenges.[99]  A director's participation in the events that gave rise to a derivative claim does not render the director incapable of considering a demand.  *See, e.g.*, *Zuckerberg*, 262 A.3d at 1039, 1041–42, 1063–64 (concluding that a director who was on the special committee that recommended and the board that approved an allegedly conflicted reclassification was independent despite those and other allegations); *cf. Wood v. Baum*, 953 A.2d 136, 142 (Del. 2008) ("Delaware law on this point is clear:  board approval of a transaction, even one that later proves to be improper, without more, is an insufficient basis to infer culpable knowledge or bad faith on the part of individual directors.").  These allegations, without more, are insufficient to call into question a director's inability to consider demand.  *Khanna*, 2006 WL 1388744, at *15 n.92 ("Although there may be instances in which a director's voting history would be sufficient to negate a director's presumed independence, routine consensus

---

[99] *See* Pl.'s Answering Br. 44–45 (arguing that Fritjofsson "approved of Mathé's plan," "was complicit in Mathé's and Vogel's vote to oust Rith and to hide Rith's firing and the SAFE financing scheme," and that Fritjofsson "feigned surprise" when Dearing "demanded answers").  Plaintiff's argument in its briefing that Fritjofsson "was involved in the minutia of seeking the least diligent investors for the SAFE financing" far exceeds the only particularized allegation in the Amended Complaint upon which it relies—that Mathé blind copied Fritjofsson on an email.  *Compare id.* at 45, *with* Compl. ¶ 77.  "Delaware law does not permit plaintiffs to amend their complaint through briefing." *Parseghian as trustee of Gregory J. Parseghian Revocable Tr. v. Frequency Therapeutics, Inc.*, 2022 WL 2208899, at *11 n.82 (Del. Ch. June 21, 2022).

cannot suffice to demonstrate disloyalty on the part of a director. To conclude otherwise would simply encourage staged disagreements and nonunanimous decisions for the sake of nonunanimous decisions in the boardroom."); *see also Kaufman v. Belmont*, 479 A.2d 282, 287 (Del. Ch. 1984) ("A mere allegation of acquiescence without more is insufficient to show breach of fiduciary duty or lack of independence or disinterestedness.").

Plaintiff's argument that Fritjofsson is not independent from Mathé is grounded in two theories: that Fritjofsson faced a risk of retaliation if he dissented and that Fritjofsson acted to promote Mathé's self-interest. The court can dispense with the first argument summarily. Plaintiff ignores that Mathé did not have the power to remove Fritjofsson as a director of Mixmax.[100] Mathé's purported control is over the three common director seats.[101] Fritjofsson is not a common director; he is Creandum's designee and, therefore, Mathé could not remove him.[102]

The second argument is also unpersuasive and lacks particularized allegations to support it.

> To create a reasonable doubt about an outside director's independence, a plaintiff must plead facts that would support the inference that because of the nature of a relationship or additional circumstances other

---

[100] Plaintiff does not allege that Mathé had any other power over or ability to retaliate against Fritjofsson.

[101] Compl. ¶¶ 17, 21, 27.

[102] *Id.* ¶¶ 19, 27.

than the interested director's stock ownership or voting power, the non-interested director would be more willing to risk his or her reputation than risk the relationship with the interested director.

*Beam*, 845 A.2d at 1052 (Del. 2004).

The Amended Complaint does not present particularized allegations giving rise to a reasonable inference that such a relationship existed between Fritjofsson and Mathé. There are no allegations that Fritjofsson and Mathé had any business or personal relationship outside of Mixmax. There are no allegations that Mathé had any authority or influence over Fritjofsson's position at Creandum.

By contrast, in *In re Straight Path Communications Inc. Consolidated Stockholder Litigation*, upon which Plaintiff relies, this court found it reasonably conceivable that a fiduciary lacked independence from and acted "to advance the self-interest of" his father with whom he had a close personal relationship. 2022 WL 484420, at *15 (Del. Ch. Feb. 17, 2022). Specifically, the fiduciary had weekly phone calls and visits with his father for a number of years, received the balance of his down payment for his home from his father, and the two were generally "actively involved in each other's lives and maintained a familial relationship." *Id.* There are no such allegations here.

Finally, Plaintiff argues that Fritjofsson "operated under a controlled mindset" in executing Mathé's bidding with the knowledge that any disapproval might result

in retaliation.[103]  Beyond being conclusory as to the substance of this theory, this unexplored assertion once again ignores that Mathé did not possess the power to remove Fritjofsson, and there are no other particularized allegations supporting a reasonable inference that Mathé could otherwise exact retribution against or otherwise control Fritjofsson.

Plaintiff's particularized allegations, considered in context and in their totality, fall far short of creating a reasonable inference that Fritjofsson lacked independence from Mathé.  Accordingly, the court concludes that Plaintiff has failed to allege facts that create reason to doubt Fritjofsson's ability to consider a demand.

## III. CONCLUSION

The Amended Complaint does not allege with particularity facts that would create reason to doubt that three of the five members of the Demand Board—Dearing, Bar-Cohen, and Fritjofsson—are capable of considering a demand to pursue the claims alleged against Mathé and Vogel.  Accordingly, demand was not futile, and the Amended Complaint must be dismissed because demand was not excused as of the filing of the Amended Complaint.  For the foregoing reasons, the motion to dismiss is granted in full.

---

[103] Pl.'s Answering Br. 45–46.